United States District Court
Southern District of Texas
FILED

JAN - 6 2021

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas

**ENTERED**
January 06, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

|  |  |  |
|---|---|---|
| OLGA O. MENDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:19-CV-291 |
| | § | |
| ANDREW M. SAUL, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Olga O. Mendez filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's denial of disability benefits. Plaintiff's application alleged that she became disabled at age 48 due to numerous ailments, including diabetes, headaches, hyperlipidemia, and depression. This is Plaintiff's second trip to federal court challenging the denial of disability benefits. After her first appeal, the District Court reversed the Commissioner's initial denial and remanded the case because the Administrative Law Judge (ALJ) did not sufficiently explain the weight given to a consulting psychologist's evaluation of Plaintiff's mental health. (*See* Civ. No. 7:14-cv-715, Docket Nos. 20, 22.) Remand was ordered "without expressing an opinion on what the ultimate decision . . . should be." (*Id.* at Docket No. 22.) After conducting a new hearing, a new ALJ issued a new decision but with the same result—Plaintiff's request for benefits was denied.

Plaintiff now appeals the Commissioner's second denial. She claims the second ALJ erred in two primary ways: 1) his residual functional capacity (RFC) determination failed to include all of her mental limitations; and 2) the ALJ's finding that she could do her past work as a seamstress was inconsistent with his RFC finding that she should avoid dangerous moving machinery. (Docket No. 11, at 1, 4-5.) While Plaintiff's initial disability application seemed to

emphasize physical limitations caused various medical conditions, her principal challenge to the Commissioner's second decision focuses on limitations related to her mental capability.  Pending before the Court are Plaintiff's and the Commissioner's motions for summary judgment. (Docket Nos. 10, 12.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that Plaintiff's claims lack merit.  As explained further below, the ALJ's mental RFC finding is supported by substantial evidence, including medical findings (or lack thereof), Plaintiff's activities, and the ALJ's credibility assessment.  In addition, the ALJ's finding that Plaintiff is able to perform her past relevant work as a sewing-machine operator is supported by substantial evidence, including the testimony of the vocational expert.   Accordingly, it is recommended that summary judgment be granted in favor of the Commissioner.

## I. BACKGROUND

On October 3, 2011, Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and section 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f, respectively.  (*See* Tr. 86-91.)[1]  Plaintiff alleged that she became disabled on June 1, 2009, due to diabetes, headaches, depression, hyperlipidemia,

---

[1] The Commissioner has filed a transcript of the record of the administrative proceedings (Docket No. 8), which will be cited as "Tr."  The specific page of the administrative transcript will be cited by reference to the page numbers in bold typeface located in the bottom right corner of the transcript pages.

anemia, and a "lump on her breast right side." (Tr. 147, 180.) Plaintiff's application was denied initially and on reconsideration. Plaintiff then requested a hearing before an ALJ, which was held on February 6, 2013. (Tr. 70-85.) After the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled because she was able to perform jobs existing in substantial numbers in the national economy. (Tr. 50-65.)

Plaintiff next filed a request with the Social Security Administration's Appeals Council to review the ALJ's adverse decision. The Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision for purposes of judicial review. (Tr. 31-33.) Plaintiff then challenged the denial of benefits in the U.S. District Court for the Southern District of Texas. In a report and recommendation, Magistrate Judge Ramos concluded that the case should be remanded because the ALJ failed "to sufficiently explain his reasoning about the value or weight placed" on a psychological consultative report by Michael Heffernan, Ph.D. (Civ. No. 7:19-cv-291, Docket No. 20, at 14.) The District Court adopted the report and, as noted, remanded the case without expressing an opinion on the merits of Plaintiff's disability claim. (*Id.* at Docket No. 22.)

On remand, the Appeals Council vacated the prior decision and remanded the matter to an ALJ, with instructions to offer plaintiff an opportunity for a hearing and to issue a new decision. (Tr. 487.) Consistent with this, a different ALJ held a second hearing on February 8, 2019. (Tr. 407-23.) After the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled, although the findings and reasoning were different.[2] (Tr. 384-96.) Notably,

---

[2] Although the findings and conclusions of the two ALJs differed, the second ALJ was not bound by the findings of the first ALJ. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("When the Secretary remands cases for re-determination, there is no rule of issue preclusion."); *see also Valek v. Shalala*, 56 F.3d 1385 (5th Cir. 1995) (stating that, after a remand, "in making this 'new decision,' the ALJ would not be bound by his previous findings because, under the

the ALJ found that Plaintiff was not disabled because she was able to perform her past relevant work as a sewing machine operator. (Tr. 395.) This rendered the ALJ's decision the Commissioner's final decision for purposes of judicial review.

In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized as it relates to her claims.[3]

## A.    Education, Work Experience, and Activities

At the time of the second administrative decision, Plaintiff was 56 years old. (Tr. 147, 396.) She completed the 6th grade in Mexico, and she is only able to read and write in Spanish. (Tr. 179, 181, 412.)

Her work history is limited. Between 2007 and 2009, Plaintiff was employed as a seamstress, an assembler of mini-blinds, and as a cabinet-maker. (Tr. 170, 181, 186.) Most recently between 2008 and 2009, Plaintiff worked at a boot factory where she sewed boots and assisted customers. (Tr. 187.) At the boot factory, she walked, stood, sat, and stooped for equal parts throughout her shift. (*Id.*) She did little to no lifting in this job but would handle objects for the majority of the day. (*Id.*) According to Plaintiff, she used "machines, tools, or equipment," as well as utilized "technical knowledge or skills" for this position. (*Id.*) Approximately two years earlier, Plaintiff had a similar job "sew[ing] shoes all day." (Tr. 190.)

In her employment as a mini-blinds assembler, she stood most of the day and rarely lifted anything weighing more than 10 pounds. (Tr. 188.) Throughout her shift, she would mostly stand as she gathered the materials needed to put the blinds together. (*Id.*) In her job making

---

social security regulations, there is no rule of issue preclusion") (citing *Muse*, 925 F.2d at 790 and 20 C.F.R. § 404.977(b)).

[3]   The Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

cabinets, she primarily "assembled handles and tickets on cabinets," lifting boxes weighing up to

20 pounds, and stood most of the day.  (Tr. 189.)

> Plaintiff described her daily activities in her application.  According to Plaintiff, she:
>
> forgets everything, has a hard time focusing, concentrating, gets headaches [and] feels a lot of pressure in her head, tries to read but forgets the little bit she has already read, forgets where she is going.  Has low platelets, anemia, is always sleepy, tired [and] just wants to sleep.  [She is] depressed [and] stays isolated.

(Tr. 194.)  When she walks, her "heart starts to beat fast," feels fatigued with "no strength," and

has to stop for frequent breaks.  (Tr. 199, 227.)  Too many people talking around her causes her

dizziness and is distracting.  (Tr. 199, 213.)  She also believes that her conditions affect her

ability to complete tasks, concentrate, understand, and follow instructions.  (Tr. 199.)

> Notwithstanding this, she is able to prepare simple meals, take her children to school, and

helps to care for her pets.  (Tr. 195, 223-24.)  Plaintiff is able to dress herself and take care of her

other "personal grooming needs."  (Tr. 217, 223.)  She also is able to do chores such as laundry,

sweeping, washing dishes, and watering plants.  (Tr. 196-97, 224.)  She shops for groceries once

a month.  (Tr. 197, 225.)  Plaintiff socializes only with family members, but prefers that there are

not "too many people [ ] at one time."  (Tr. 198-99, 218.)

> Although Plaintiff goes outside regularly, she tries to avoid the sun because "the touch of

the sun's rays" bothers her.  (Tr. 218.)  Plaintiff also claims she has poor vision, which she

believes would make it difficult to continue her employment as a seamstress.  (Tr. 231.)

## B.   The Medical Evidence

> When Plaintiff filed her application for disability benefits on October 3, 2011, she alleged

that she was unable to work due to numerous physical ailments, including diabetes,

hyperlipidemia, anemia, and a "lump on her breast right side."  (Tr. 180.)  In stating the mental

conditions that limited her ability to work, Plaintiff's initial application listed only the following:

headaches and depression. (*Id.*) Although the record reflects a history of various treatments for her physical ailments, Plaintiff's medical history is sparse as to treatment for her mental impairments. Nonetheless, Plaintiff's challenge to the ALJ's decision focuses on her mental impairments. (*See* Docket No. 11.) This summary of the medical evidence will likewise focus on her mental condition.

After Plaintiff filed her disability application, Dr. Heffernan performed a psychological evaluation at the request of the Commissioner. Plaintiff appeared with "[n]ormal grooming" and a "cooperative attitude." (Tr. 311.) She described her chief complaint as follows: "Memory loss. Tired all the time because I have diabetes." (*Id.*) When asked to describe her medical problems, she stated "diabetes, headaches, depression, difficulty with memory and focusing, anemia, [and] high cholesterol." (Tr. 312.) She was not taking any psychiatric medications, has not been hospitalized for psychiatric disorders, and did not report any history of anxiety or panic attacks. (Tr. 311.)

As to her daily activities, Plaintiff performs all of her self-care including "dressing and grooming," and she requires no assistance with "simple household chores and simple meal preparation." (Tr. 312.) Her sleep patterns are normal. (*Id.*) She can drive and navigate public transportation without assistance. (*Id.*) However, she reported that she needs assistance with paying bills, keeping track of her finances, and shopping. (*Id.*) Plaintiff has "no difficulty interacting with others"; however, her personal relationships are limited to family members. (*Id.*)

As to the "mental status" portion of the examination, Dr. Heffernan found that Plaintiff exhibited a "normal activity level and arousal" (Tr. 313) as well as "affect [that] was seen overall as normal" (Tr. 314). When asked how she feels most of the time, Plaintiff responded, "normal."

(Tr. 314.)  She also denied that there were any "situations or things that make [her] feel very anxious."  (*Id.*)  Plaintiff is able to "control [her] own thoughts," and she does not experience delusions or paranoia.  (Tr. 313.)  Plaintiff further exhibited adequate "stress coping," which indicated a "low risk of decompensation."  (*Id.*)  In addition, although her insight appeared to be compromised, her overall judgment "seems adequate."  (Tr. 315.)

Dr. Heffernan tested Plaintiff's mental abilities by asking her to perform various tasks such as counting backward from 20, subtracting from 100 by 3s and 7s, repeating names of objects in the room, and recognizing similarities between concepts or objects.  Based on her responses, Dr. Heffernan concluded that Plaintiff's mental status was impaired in the following ways:

- "Client was unable to concentrate throughout the entire interview without interruptions and/or the need to repeat questions. . . . Attention and concentration is therefore impaired."

- "Thoughts proceeded at below normal rate with evidence of retarded and inhibited thinking."

- Plaintiff "repeated only 4 digits forward and none backward.  Examiner's name was not remembered. . . . Client did not remember the last three presidents.  Names of three objects in the room were not remembered after an intervening period of five minutes.  Based on this data this client's memory is impaired."

(Tr. 313-14.)

As to Plaintiff's "sensorium and cognition," she appeared "oriented x 3," was able to provide accurate historical information "without prompting," and she knew that Paris was the

capital of France. (Tr. 315.)  However, she was unable to complete a number series and could

not state any similarities between "north and west" and "eye and ear." (*Id.*)  Based on this, Dr.

Heffernan found Plaintiff's "cognition [to be] inadequate." (*Id.*)

Dr. Heffernan found no evidence that Plaintiff had "any organic brain disorder" and no

evidence of any "psychotic disorder." (*Id.* at 316.)  Ultimately, Dr. Heffernan diagnosed

Plaintiff with "Cognitive Disorder NOS" (i.e., not otherwise specified). (*Id.* at 315.)  He stated

that her "[p]rognosis is guarded given multiple cognitive deficits."

On February 2, 2012, Dr. Robert Gilliland, a state agency medical consultant (SAMC),

completed a psychiatric assessment (called "Psychiatric Review Technique") and a Mental

Residual Functional Capacity Assessment. (Tr. 318-19, 328-34.)  Based on Plaintiff's medical

records and reported activities, Dr. Gilliland found that Plaintiff had an "organic mental

disorder." (Tr. 318.)  In assessing Plaintiff's functional limitations, Dr. Gilliland found the

following: she had mild restrictions on daily living; mild difficulties in maintaining social

functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr.

328.)  In reaching these conclusions, Dr. Gilliland provided a fairly detailed summary of

Plaintiff's relevant medical records. (Tr. 330.)  The doctor noted that although the Plaintiff

reported that she "forgets often" and "needs reminders" to take her medications, her "[a]lleged

limitations are not fully supported by the" evidence of record. (Tr. 330.)

In assessing Plaintiff's mental residual functional capacity assessment, Dr. Gilliland

concluded:

> [Plaintiff] can understand, remember, and carry out only simple instructions,
> make simple decisions, attend and concentrate for extended periods, interact
> adequately with co-workers and supervisors, [and] respond appropriately to
> changes in routine work setting.

(Tr. 334.)  About four months later, on May 21, 2012, another SAMC, Dr. Veena Ghai, reveiwed Plaintiff's records and "affirmed" the conclusions of Dr. Gilliland.  (Tr. 348, 350.)

## C.    The Evidentiary Hearing

The ALJ held the evidentiary hearing on February 8, 2019, by video conference.  (Tr. 407-23.)  Two witnesses testified: Plaintiff and Rene Anocosa, a vocational expert.  Plaintiff was represented at the hearing by Dennis Neitsch.[4]

Plaintiff testified in response to questions from the ALJ and Mr. Neitsch.  At the time of the hearing, Plaintiff was 56 years old.  She is married and lives with her family.  Plaintiff stated that she completed the 6th grade in Mexico, but not necessarily every grade prior to that.  (Tr. 412, 415.)  Although Plaintiff does not speak English, she is able to drive and can "read the street signs in English."  (Tr. 413.)

Plaintiff suffers from anxiety and depression, but she does not take any medication to treat those ailments.  (Tr. 412, 414.)  Plaintiff does take medication to treat her diabetes, high cholesterol, and "kidney problems."  (Tr. 414.)  The medications help her conditions and she does not experience any side effects from them.  (Tr. 414-15.)

Plaintiff stated that the "biggest problem" she has with working is that if she goes "to do several things, [she does] not remember them all."  (*Id.*)  Most recently, Plaintiff worked part-time at a job where she had to stand by a conveyor belt and "remove the items that are not good."  (Tr. 416.)  She was able to do this job in part because it was a simple task.  (*Id.*)

In discussing her memory issues presently, she stated that when cooking for her family, she "can do only one thing at a time and focus on it[,] . . . not several to be more focused."  (*Id.*)

---

[4]  Plaintiff was represented by counsel in applying for disability benefits.  (Tr. 384.)  Mr. Neitsch is apparently a non-attorney representative who assisted Plaintiff at the hearing.  (Tr. 384.)

She can still drive a car, but sometimes she forgets where she was going. (*Id.*) Similarly, when Plaintiff reads, she is only able to "remember part of it, a few words, not all of it." (*Id.*) Finally, according to Plaintiff, when her sugar levels get too low, she gets dizzy. (Tr. 417.) This could result in her missing two days of work per week. (*Id.*)

Mr. Anocosa, the vocational expert, was present during Plaintiff's testimony. Mr. Anocosa began by classifying Plaintiff's previous employment as a "seamstress" or "sewing machine operator" "at the light exertional level." (Tr. 417-18.)

The ALJ asked Mr. Anocosa to consider "several hypotheticals," each of which to assume the following:

> the individual was 46 years old on the alleged onset date and on the date last insured for Title II benefits she was 50 and currently is 56 years of age. She has a sixth-grade education in Spanish, is unable to communicate in English, and the past relevant work experience of [seamstress].

(Tr. 418.) In addition, for the first two hypotheticals, the individual can perform work at the medium and light exertional levels, respectively, and is able to "frequently stoop, crouch, crawl, kneel, balance; occasionally climb stairs and cannot climb ladders; and must avoid heights and dangerous moving machinery." (*Id.*) With those limitations, Mr. Anocosa stated that the individual could perform Plaintiff's past relevant work as a seamstress. (Tr. 418-19.)

In hypothetical number three, the ALJ added the following limitations:

> at the light exertional level, [t]he individual is able to understand, remember, and carry out complex instructions . . . , make decisions, and maintain concentration for sufficient time to complete those tasks, those complex tasks, and the individual is able to interact appropriately with supervisors, coworkers, and the public and respond appropriately to changes in routine settings. With those limitations could such a person still do the claimant's past work?

(Tr. 419.) Mr. Anocosa responded, "[y]es, Your Honor." (*Id.*) In hypothetical number four, which remained at the light exertional level:

The individual is able to understand, remember, and carry out simple instructions, make decisions, and maintain concentration and persistence long enough to complete those tasks, and the individual is able to interact appropriately with supervisors, coworkers, and the public and respond appropriately to changes in routine work setting.  With those limitations could such a person do the claimant's past work?

(Tr. 419.)  Mr. Anocosa responded, "[n]o, Your Honor."  (Tr. 420.)  However, with the limitations in hypothetical number four, "there [would] be other jobs such a person could do."  (*Id.*)  For example, the "individual could be a garment sorter," of which there are "approximately in the national economy [ ] 234,000 jobs."  (*Id.*)

Finally, the ALJ stated that for hypothetical number five, it is the same as the fourth, "plus the individual because of medical reasons would miss at least one day of work each week."  (*Id.*)  With those limitations, Mr. Anocosa stated "this individual would not be able to maintain competitive employment."  (*Id.*)

Plaintiff's representative asked Mr. Anocosa whether, assuming that for hypothetical four, "that this person has difficulty changing tasks" to the extent "[t]hey would need pretty much constant direction," could they maintain competitive employment?  (Tr. 421.)  The vocational expert responded in the negative.  (*Id.*)

## D.    The ALJ's Decision

In making his decision, the ALJ relied on the testimony that was presented at the hearing and the medical evidence in the record.  (Tr. 384-96.)  The ALJ applied the five-step method for evaluating disability claims.[5]

The ALJ first found (at Step One) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability.  (Tr. 387.)  In considering the severity of

---

[5] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section of this report, *infra* Part II.A.

Plaintiff's impairments (Step Two), the ALJ determined that Plaintiff had the following "severe" medical impairments: "Type II diabetes mellitus, hypertension, anemia, idiopathic thrombocytopenic purpura ('ITP'), and cognitive disorder." (*Id.*)

The ALJ also found that these medical impairments were not severe enough to meet or medically equal one of the listed impairments in the regulations (Step Three). (Tr. 388.) In reaching this conclusion, the ALJ analyzed in some detail the applicability of mental impairment listing 12.02, including whether the record establishes that Plaintiff has satisfied the "paragraph B" and "paragraph C" requirements. (Tr. 388-90.)

The ALJ next assessed Plaintiff's residual functional capacity (RFC) to do physical and mental work activities.[6] The ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can frequently stoop, crouch, crawl, kneel and balance; the claimant can occasionally climb stairs but cannot climb ladders; and, the claimant should avoid heights and dangerous moving machinery. The claimant is able to understand, remember and carryout complex instructions, make decisions and maintain concentration and persistence long enough to complete complex tasks; and the claimant can interact appropriately with supervisors, coworkers and the public and respond appropriately to changes in routine work settings.[7]

(Tr. 390-91.)

In making this finding, the ALJ assessed Plaintiff's subjective symptoms (Tr. 393-94) and provided a detailed review of the medical evidence, including the key observations and findings of the medical sources who examined Plaintiff, treated her, and/or provided an assessment of her condition. (Tr. 394-95.) Ultimately, the ALJ concluded that:

---

[6] Because Plaintiff's claims of ALJ error refer to her mental capabilities (or lack thereof) only (*see infra* Part II.B), this report will likewise focus on the ALJ's findings as they relate to Plaintiff's mental capabilities.

[7] The ALJ's RFC finding is consistent with the hypothetical number three that was presented to the vocational expert at the evidentiary hearing. (*See* Tr. 419.)

> With respect to the claimant's statements about the intensity, persistence, and limiting effects of her mental health symptoms, they are not fully consistent with the limited medical evidence of the claimant's treatment [ ] and other evidence in the record.
> ....
>
> The claimant's testimony and report of daily activities do not clearly support a finding that her functioning is reduced below the functional level indicated in the residual functional capacity set forth above.

(Tr. 393.)

Based on this RFC finding, the ALJ addressed (at Step Four) whether Plaintiff was capable of performing any of her past relevant work. (Tr. 395.) In doing so, the ALJ relied on the vocational expert's "persuasive testimony" on whether Plaintiff's "past relevant work as a sewing-machine operator would not be precluded by the [RFC] . . . as [it is] actually and generally performed in the national economy." (*Id.*) Accordingly, the ALJ found that Plaintiff is not disabled because she is capable of performing her past relevant work. (*Id.*)

### E.     Procedural History

As noted, Plaintiff seeks review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1.) The parties' cross motions for summary judgment are pending. (Docket Nos. 10, 12.) Those motions will be analyzed in light of the applicable standard of review.

## II.  ANALYSIS

### A.     Standard of Review

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that she is disabled. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); *see also Fraga v. Bowen*, 810 F.3d 1296, 1301 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir.

1983)).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)    whether the claimant is currently working in substantial gainful employment;

(2)    whether the claimant suffers from a severe impairment;

(3)    whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)    whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5)    whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis.  *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).  At Steps One through Four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at Step Five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th

Cir. 2002).   Although the burden is initially on the Commissioner at Step Five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant could perform.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "Throughout the process, the ultimate burden of establishing disability remains with the claimant."  *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at Step Four that Plaintiff retained the RFC necessary to perform her past relevant work as a sewing-machine operator.  (Tr. 395.)  As such, the ALJ's analysis did not proceed to Step Five, and the burden of proof remained with Plaintiff.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Masterson*, 309 F.3d at 272.  Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*  Evidentiary conflicts are for the Commissioner to resolve, not the courts.  *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision,

particularly given the importance of the benefits in question. *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.    Issues**

In seeking review of the Commissioner's denial of benefits, Plaintiff raises the following two issues:

1) "Whether the Administrative Law Judges (ALJ)'s residual functional capacity (RFC) determination failed to contain all of the [Step Three] limitations that the ALJ found credible."

2) "Whether the ALJ erred at Step 4 when he found that the Plaintiff could return to her past relevant work (PRW) as a sewing machine operator."

(Docket No. 11, at 1.)

The Commissioner contends in his summary judgment motion that the ALJ did not err in his RFC determination because the "mental RFC finding is consistent with and supported by the observations of treating, reviewing, and examining sources in the medical records." (Docket No. 12-1, at 11.) In addition, the Commissioner argues that the ALJ's determination that Plaintiff could perform her past relevant work is supported by the record, the testimony of the VE, and that Plaintiff has failed to meet her burden to rebut this finding. (*Id.* at 11-15.) The issues raised by the parties will be addressed in the context of the standard of review that applies in social security cases (as discussed above).

**C.    Inconsistency Between Step Three Findings and the RFC Determination**

Plaintiff alleges that the ALJ erred because his mental RFC determination did not contain all of the limitations that he found credible at Step Three. (Docket No. 11, at 4.) In particular, Plaintiff contends that the ALJ's finding at Step Three that she had a "moderate limitation in the

16

area of maintaining concentration, persistence, and pace" is an "inherent inconsistency" with his RFC finding that she could "carryout complex instructions, make decisions and maintain concentration and persistence long enough to complete complex tasks." (*Id.*) The Commissioner's argument is essentially that there is no error because the "mental RFC finding is consistent with and supported by the" evidence in the record. (Docket No. 12-1, at 11.)

    1.    <u>Step Three Findings</u>

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). The list of impairments, often called "listings," are set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See Audler v. Astrue*, 501 F.3d 445, 448 (5th Cir. 2007). The Supreme Court has described the listings as follows:

> The listings set out at 20 CFR pt. 404, subpt. P, App. 1 (pt. A) (1989), are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.

*Zebley*, 493 U.S. at 529–30 (emphasis in original; footnotes omitted). The claimant (here, Plaintiff Mendez) has the burden to prove at Step Three that her impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530–31; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

The ALJ in this case concluded that the "severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.02." (Tr. 388.) In reaching this conclusion, the regulations required the ALJ to evaluate Plaintiff's mental impairments using a

process that is often called "the technique" or "special technique." *See* 20 C.F.R. §
404.1520a(a).   In applying the technique, the ALJ "must . . . evaluate the degree of functional
loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v.
Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R. § 404.1520a(b)(3)).   Those four
functional areas are known as the "paragraph B criteria." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1
§ 12.00C.   Here,

> Paragraph B of listing 12.02 provides as follows:
>
> B. Extreme limitation of one, or marked limitation of two, of the following areas of
> mental functioning:
>
> 1.   Understand, remember, or apply information.[8]
>
> 2.   Interact with others.[9]
>
> 3.   Concentrate, persist, or maintain pace.[10]
>
> 4.   Adapt or manage oneself.[11]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(B).

Here, the ALJ "considered whether the 'paragraph B' criteria are satisfied" and
described his evaluation of the four functional areas.[12]   (Tr. 388-90.)   After reviewing the

---

[8] The ability to understand, remember, or apply information "refers to the abilities to
learn, recall, and use information to perform work activities." 20 C.F.R. Pt. 404, Subpt. P, App.
1, § 12.00(E)(1).

[9] The ability to interact with others "refers to the abilities to relate to and work with
supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)(2).

[10] The ability to concentrate, persist, or maintain pace "refers to the abilities to focus
attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P,
App. 1, § 12.00(E)(3).

[11] The ability to adapt or manage oneself "refers to the abilities to regulate emotions,
control behavior, and maintain well-being in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App.
1, § 12.00(E)(4).

[12]   The ALJ also discussed in detail how Plaintiff's physical impairments, such as
diabetes mellitus, hypertension, anemia, and ITP affected the Step Three analysis. (Tr. 388.)

evidence of record, the ALJ found that Plaintiff had "mild limitation"[13] in her ability to: 1) understand, remember, or apply information; 2) interact with others; and 3) adapt or manage oneself. (Tr. 389-90.) The ALJ further found that Plaintiff had "moderate limitation"[14] in her ability to concentrate, persist, or maintain pace. (Tr. 389-90.) As such, the ALJ concluded that "[b]ecause the claimaint's mental impairment does not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied."[15] (Tr. 390.)

Plaintiff argues that the ALJ's findings that Plaintiff had "mild limitations" and one "moderate limitation" in the "paragraph B" criteria is "directly contradictory" to the ALJ's ultimate mental RFC assessment. (Docket No. 11, at 6-9.) Specifically, in determining Plaintiff's mental RFC, the ALJ concluded that Plaintiff could "understand, remember, and carry out complex instructions." (Tr. 419.) Plaintiff contends that "[l]imitations that the ALJ finds credible at step three cannot simply disappear at steps four or five," and that "because the ALJ

---

[13] A "mild limitation" is defined as follows: "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(b).

[14] A "moderate limitation" is defined as follows: "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c).

[15] In addition, the ALJ addressed listing 12.02(C) as follows:

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant does not have a condition that is 'serious and persistent,' with a medically documented history of at least two years' duration . . . . Specifically, even during periods of reported symptoms, the claimant was able to adapt to changes, including being able to live with family, care for pets, complete household chores, engage in hobbies and interact with others. Therefore, in this case, the evidence fails to establish the presence of the 'paragraph C' criteria.

(Tr. 390.) Plaintiff does not challenge the ALJ's conclusion that the "paragraph C" criteria are not supported by the evidence.

found mental limitations at steps 2 and 3 but did not include all of those limitations in the RFC, remand is required." (*Id.* at 9, 12.)

Plaintiff's argument misconstrues the relationship between the ALJ's step three findings and his RFC determination. As the Commissioner points out, "the limitations identified in the 'paragraph B' and 'paragraph C' criteria of the mental disorders listings, as considered in the special technique, are <u>not</u> a RFC assessment but are used to rate the severity of a claimant's mental impairment(s) at steps two and three of the sequential evaluation process." (Docket No. 12-1, at 6 (citing Social Security Ruling (SSR) 96-8p) (other citations omitted).) Courts have recognized that Plaintiff's argument "conflates separate inquiries." *Jacobs v. Berryhill*, No. 5-17-CV-429-XR-RBF, 2018 WL 3323764, at *4-5 (W.D. Tex. July 6, 2018), *report and recommendation adopted*, No. SA-17-CV-429-XR, 2018 WL 4688775 (W.D. Tex. July 24, 2018); *see also Ward v. Colvin*, No. CV G–15–095, 2016 WL 3919665, at *10 (S.D. Tex. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 3855871 (S.D. Tex. July 15, 2016) (concluding that the plaintiff's "argument that the ALJ's evaluation at Steps 2 and 3 necessarily supports a decreased RFC [residual-functional-capacity] determination is improper"). As another Texas federal court has explained, "[a]lthough the ALJ must consider the claimant's 'paragraph B' functional limitations when determining the mental RFC, he is not required to incorporate them into his RFC assessment 'word-for-word.'" *Holmes v. Astrue*, No. 3:11-CV-2634-G BH, 2013 WL 638830, at *13 (N.D. Tex. Jan. 25, 2013), *report and recommendation adopted*, No. 3:11-CV-2634-G BH, 2013 WL 646510 (N.D. Tex. Feb. 20, 2013) (citations omitted).

The key issue is not whether the ALJ erred in failing to incorporate his Step Three findings into Plaintiff's mental RFC, but rather whether the ALJ's mental RFC finding is supported by substantial evidence in the record. *See Masterson*, 309 F.3d at 272.

2.   Mental RFC Finding

The ALJ found that Plaintiff "is able to understand, remember, and carry out complex instructions . . . [and] make decisions, and maintain concentration for sufficient time to complete . . . those complex tasks." (Tr. 419.) Whether the ALJ's mental RFC is supported by substantial evidence may depend on what he meant by Plaintiff's ability to perform "complex" tasks. If he meant Plaintiff could solve complex quadratic equations or build a rocket, the evidence would not support such a finding. But if the ALJ meant that Plaintiff could perform tasks that required something more than simple steps, such as would be required in the work of a seamstress, the question of substantial evidence is a closer question. It is apparent that the ALJ used the term "complex" in the latter sense.

This conclusion is consistent with the regulatory guidance on assessing non-exertional limitations. As other courts have observed: "The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3)("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks")." *Hernandez v. Berryhill*, No. EP-17-CV-25-MAT, 2018 WL 4016475, at *2 (W.D. Tex. Aug. 22, 2018) (quoting *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005)).

In determining whether there is substantial evidence to support the ALJ's finding that Plaintiff can perform work requiring more than the ability to do simple tasks, courts weigh factors such as the following: "(1) objective medical facts or clinical findings; (2) diagnoses and opinions of treating and examining physicians; (3) Plaintiff's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history." *Hardy v. Berryhill*, No. 6-18-CV-00363-ADA, 2020 WL 5793431, at *2 (W.D. Tex. Sept. 29, 2020) (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)). Here, the first three of those factors are the most relevant.

> ### a.   Medical Evidence

As the ALJ discussed in his decision, the medical record reflects little (if any) evidence to support Plaintiff's claims about the extent of her mental limitations:

> The record is devoid of any evidence relating to the claimant's cognitive disorder not otherwise specified aside from her diagnosis [by Dr. Heffernan]. While the record does, however, indicate that the claimant has suffered issues relating to her depression and anxiety, these conditions appear to have been merely reported to primary care physicians, described as situational, treated with monitoring and she admittedly did not seek out pharmaceutical medication or counseling (Exhibit 2F; Exhibit 4F; Exhibit 9F; Exhibit 14F; Exhibits 15F-l 7F). Moreover, despite reports of feeling depression and anxiety, mental status examinations have documented generally normal cognitive and psychiatric findings and screenings have been negative (Exhibit 5F, p. 4; Exhibit 15F, p. 17, 51, 56; Exhibit 16F, p. 8-9, 12; Exhibit 17F, p. 33). To illustrate, even when displaying tearful mood in September 2012, the claimant was oriented X3, displayed intact recent and remote memory, judgment and insight, and received no treatment aside from monitoring (Exhibit 14F, p. 7). In a more recent encounter visit in May 2018, her provider notes the claimant's normal functionality, she was well-oriented x 4, interactive, respectful, attentive, involved and receptive during the visit with primary care (Exhibit 16F, p. 8). With respect to her mental status, she presented as alert and engaged, with direct eye contact and high verbalization, displayed appropriate affect, congruent with mood, broad affect, normal cognition, denied suicidal or homicidal thoughts, and showed good insight and judgment (Id. at 9).

(Tr. 393-94.)  The Commissioner's briefing likewise discusses evidence from Plaintiff's medical records suggesting that for years there was no indication that she suffered from significant mental impairments.

> b.   *Opinions of Consulting Experts*

Plaintiff challenges the ALJ's assessment of the findings and opinions of Dr. Heffernan, as well as that of state agency medical consultant, Dr. Gilliland, as they relate to her mental RFC.[16]  (Docket No. 11, at 9-12.)  Plaintiff faults the ALJ for assigning their opinions only "some weight" rather than controlling weight.

Plaintiff's criticisms of the ALJ's assessment of the findings and opinions of Drs. Heffernan and Gilliland reflect a misunderstanding of the role of the ALJ and the applicable standard of review.  Weighing the evidence, including expert opinion, and assessing credibility are matters reserved for the ALJ.  *Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001); *see also Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)).  An "ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)).  Such determinations must be affirmed where they are supported by substantial evidence in the record.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*

---

[16] As noted earlier, Dr. Ghai (another SAMC) concurred with Dr. Gilliland's assessment. For simplicity, this discussion will refer only to Dr. Gilliland.

To begin with, the ALJ's written decision reflects a detailed assessment of the medical evidence from Dr. Heffernan:

> During her psychiatric consultation discussed above with Dr. Heffernan, the claimant reported being in a good mood and when asked about her mood most of the time – whether normal, depressed, anxious, sad or angry – the claimant responded "normal." Although impairments were observed with respect to the claimant's cognition, memory, attention and concentration, she displayed adequate stress coping indicating low risk of decompensation, normal appearance, behavior and speech, normal thought process, no abnormal thoughts or perceptual abnormalities, normal mood and affect and normal judgment. Nonetheless, the claimant has testified to her own difficulties with memory, attention, mood regulation, and social interactions. In consideration of the aforementioned limitations, the claimant has been limited to work where she is able to understand, remember and carryout complex instructions, make decisions and maintain concentration and persistence long enough to complete complex tasks and she can interact appropriately with supervisors, coworkers and the public and respond appropriately to changes in routine work settings.
>
> As for the opinion evidence relating to the claimant's mental impairments, the residual functional capacity detailed above is consistent with and supported by the observations of treating, reviewing and examining sources in the medical records. In reaching this conclusion, weight has been assigned to the various opinions in the file as follows. Based on the consultative examination, Dr. Heffernan assigned a GAF score of 44% and opined that the claimant has serious symptoms and impairment in social, occupational functioning but found no evidence in support of any organic brain disorder and no evidence of any psychotic disorder. This opinion is afforded some weight. As a preliminary matter, the undersigned gives little weight[17] to the Global Assessment of

---

[17] The ALJ noted that Dr. Heffernan assigned Plaintiff a GAF score of 44, but the ALJ gave "little weight" to this since it was inconsistent with some of the clinical findings in his report. (Tr. 394.) The ALJ also noted that GAF scores "are considered a snapshot of functioning at the time of examination" and "have no 'direct correlation to the severity requirements [of the] mental disorder listings.'" (*Id.*; citation omitted.) The ALJ's position on the relevance of GAF scoring is consistent with observations by the Fifth Circuit and other courts. As the Fifth Circuit has noted, a GAF score is a "subjective" assessment that may or may not be consistent with objective findings. *Foster v. Astrue*, 277 F. App'x 462, 464 (5th Cir. 2008) (unpublished). Other courts have found that GAF score assessments have limited relevance in disability determinations. *See Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) ("GAF scores have no direct correlation to the severity requirements of the mental disorders listing") (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)); *see also Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 2006 WL 305648, at *14 (6th Cir. Feb. 9, 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment

Functioning (GAF) score itself because the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements [of the] mental disorder listings.' Thus, although GAF scores can be helpful in an ALJ's decision-making process, they are considered a snapshot of functioning at the time of the examination and not determinative of overall disability. The remainder of Dr. Heffernan's opinion, however, has been afforded some weight and, as such, the undersigned has limited the claimant to the residual functional capacity set forth above.

Notably, Dr. Heffernan has program familiarity and his findings are based upon examination, are detailed and generally consistent with the claimant's testimony, and activity level.

(Tr. 394-95 (internal citations omitted).)

Likewise, the ALJ explained his assessment of Dr. Gilliland's findings and opinions, as

set out in his report:

Some weight is given to an assessment proffered by reviewing consultant on behalf of DDS, Dr. Robert Gilliland, MD, [ ] in February 2012, opining that the claimant's mental disorder results in a moderate functional limitation in maintaining concentration, persistence and pace but merely mild restriction in activities of daily living and maintaining social functioning with no episodes of decompensation, each of extended duration. Based on its general consistency with the overall record, this opinion is afforded some weight and accounted for it in the residual functional capacity set forth above. Conversely, little weight is given to Dr. Gilliland's mental residual functional capacity assessment finding marked limitations in the claimant's ability to understand, remember and carry out detailed instructions, [ ] as this opinion is inconsistent with the claimant's treatment record – or lack thereof – and her successful activities of daily living discussed above. Upon reconsideration, opinions set forth . . . by Dr. Veena Ghai, MD, in May 2012, affirming Dr. Gilliland's opinions are afforded corresponding weight.

(Tr. 395 (internal citations omitted).)

This is not a case where the ALJ completely failed to explain the weight he was assigning

to the medical experts' opinions. *See Mendez*, 2017 WL 4329791, at *5. Rather, the ALJ

explained that as to the GAF score in Dr. Heffernan's opinion, *see supra* n.17, he was assigning

---

Functioning] score in the first place."); *Habib v. Astrue*, No. 09-82, 2010 WL 1048956, at *7 (M.D. Fla. Mar. 10, 2010) ("a GAF score is of limited, if not questionable, value").

it "little weight" due to its minimal applicability to the overall disability determination. (Tr. 394.) Significantly, the ALJ "afforded some weight" to the "remainder" of Dr. Heffernan's opinion and, as such, limited Plaintiff's mental RFC in accordance with that opinion.[18] (*Id.*)

It is notable that Dr. Heffernan's conclusions were based entirely on Plaintiff's responses to the questions he posed. To be sure, based on her responses, he concluded that Plaintiff had "impaired" attention and concentration, "evidence of retarded and inhibited thinking," "impaired" memory, and "inadequate" cognition. (Tr. 313-15.)

However, as the ALJ emphasized, his mental RFC finding is more consistent with "the observations of treating, reviewing and examining sources in the medical records." (Tr. 394.) During her medical treatment spanning several years, there is no indication Plaintiff had any significant mental impairment. The ALJ's finding is also supported by Plaintiff's description of her activities. For example, during her evaluation with Dr. Heffernan, she reported requiring no assistance with all of her "self-care skills including dressing and grooming," simple household chores and simple meal preparation, and no difficulty interacting with others. (Tr. 312.)

The ALJ also explained the specific weight he was assigning to Dr. Gilliland's opinion.[19] (Tr. 395.) Specifically, regarding his mental RFC assessment "finding marked limitations in the claimant's ability to understand, remember and carry out detailed instructions," the ALJ assigned it "little weight." (*Id.*) The ALJ explained that this finding "is inconsistent with the claimant's

---

[18] The ALJ's statement that he "limited" Plaintiff's RFC based on Dr. Heffernan's opinion further suggests that the ALJ used the word "complex" in that context to mean something more than simple.

[19] The relevant regulations explain that the state agency consultants "are highly qualified" physicians and psychologists "who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). As such, the ALJ "must consider findings of State agency medical and psychological consultants . . . as opinion evidence," except on the ultimate issue of disability. *Id.*

treatment record – or lack thereof—and her successful activities of daily living."[20]   (*Id.*)  Again, the ALJ noted that "[t]he record is devoid of any evidence relating to the claimant's cognitive disorder not otherwise specified aside from her diagnosis."[21]  (Tr. 393.)  On the other hand, the ALJ explained that the remainder of Dr. Gilliland's opinion was afforded "some weight and accounted for" in Plaintiff's mental RFC assessment.[22]  (Tr. 395.)

As can be seen, the ALJ discussed in detail the opinion evidence from Drs. Heffernan and Gilliland.  As the ALJ summarized, his "residual functional capacity assessment is supported by the medical evidence, the claimant's testimony and self-reported abilities and activities of daily living, and the opinion evidence described above."  (Tr. 395.)  Because it is the ALJ's role to assess the evidence, including the evidence from expert medical sources, and because the ALJ's assessment is supported by substantial evidence, Plaintiff's challenge to the ALJ's consideration of evidence from Drs. Heffernan and Gilliland should be rejected.

c.      *Credibility of Plaintiff's Subjective Symptoms*

---

[20] The ALJ's findings as to Plaintiff's ability to perform her activities of daily living are discussed in the next section.  *See infra* Part II.C.2.c.

[21] Although as recently as February 2019 Plaintiff stated that she still suffers from anxiety and depression, she does not take any medication to treat those ailments.  (Tr. 412, 414.)  According to her representative at the evidentiary hearing, Mr. Neitsch stated that Plaintiff's "biggest problem for the mental side is confusion and concentration problems rather than the depression and anxiety."  (Tr. 415.)  In any event, the medical evidence in the record confirms that Plaintiff has sought minimal treatment for her depression and anxiety and that her struggles with depression and anxiety have had a minimal effect on her daily abilities.  (*See* Tr. 275-79, 305, 309, 314, 340-41, 369, 394, 773, 807, 812, 841-42.)

[22] Notably, the ALJ did not find that Plaintiff had no severe impairments, or that she could perform all types of work.  Rather, he found that she had numerous severe impairments that significantly limited her RFC to a restricted range of light work.  In support of this, the ALJ assigned "little weight" "to a medical evaluation performed on behalf of DDS by Dr. Patty Rowley, M.D., in February 2012."  (Tr. 336, 395.)  Specifically, the ALJ determined that Dr. Rowley's finding that Plaintiff had "no severe impairment [was] inconsistent with the claimant's testimony, with Dr. Heffernan's findings discussed above, and furthermore, not based upon a first-hand examination of the claimant."  (Tr. 395.)

The ALJ summarized Plaintiff's hearing testimony and her self-reported abilities regarding the "intensity, persistence, and limiting effects of her mental health symptoms." (Tr. 393.) However, the ALJ found that her alleged symptoms "are not fully consistent with the limited medical evidence of the claimant's treatment and other evidence in the record." (*Id.*)

With regard to Plaintiff's daily activities, the ALJ stated:

> Moreover, the claimant describes her consistent abilities to attend to her own daily activities, including caring for husband, children and pets, cooking, household chores, laundry, occasional driving, shopping and attending appointments.
> ....
>
> For example, the claimant reported being able to live with her sister, complete household chores, attend appointments, and socialize with family. Although the claimant testified to anxious and depressed mood, and social anxiety, she also reported taking no medication for these conditions, no mental health counseling, that she cares for her family, goes outside, is capable of managing finances, driving albeit short distances, and caring for pets. The claimant further indicated that her hobbies include reading and watching TV.

(Tr. 393.)

Assessing Plaintiff's credibility and determining what weight to give to her testimony are tasks reserved for the ALJ. *See Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (an ALJ's credibility determinations are entitled to "great deference"); *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("the ALJ as factfinder has the sole responsibility for weighing the evidence"). In particular, an ALJ's determination whether subjective complaints are disabling is "entitled to considerable deference." *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

In addition to the deference accorded to the ALJ's credibility finding, the record here supports his conclusion that Plaintiff engages in "successful activities of daily living." (Tr. 395.) Plaintiff's statements in her application, as well as at the evidentiary hearing, describe a wide range of daily activities, including the following:

28

- Cooking for herself and her family (Tr. 195, 224, 416);

- Taking care of her personal hygiene (Tr. 75);

- Taking care of pets (Tr. 195, 223);

- Performing household chores, such as laundry, sweeping, and dishes (Tr. 76, 196, 224);

- Driving (Tr. 75, 197, 225, 413);

- Shopping (Tr. 75, 197, 225);

- Spending time with family (198-99); and

- Attending church (Tr. 226).[23]

As the ALJ found, Plaintiff's self-reported daily activities lend support to the conclusion that her mental limitations are not as severe as she alleges. (Tr. 24.)

In sum, the ALJ's mental RFC finding is supported by Plaintiff's medical records and his assessment of Plaintiff's credibility. Such evidence, while far from overwhelming in this case, amounts to more than a "scintilla" and thus constitutes substantial evidence. The issue is not whether the court agrees with the ALJ or would have reached the same conclusion; again, a federal court may neither reweigh the evidence, nor substitute its judgment for the ALJ's. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

## D.   Plaintiff's Past Relevant Work – Dangerous Moving Machinery

Plaintiff's second claim asks "[w]hether the ALJ erred at Step 4 when he found that the Plaintiff could return to her past relevant work (PRW) as a sewing machine operator." (Docket

---

[23] Plaintiff's husband also filled out a "function report" regarding Plaintiff's limitations, confirming that she has the ability to do the following: 1) prepare simple and complete meals; 2) laundry and light house cleaning; 3) drive a car; 4) go grocery shopping; 5) watch television; and 6) attend church. (Tr. 233-35.) To be sure, Plaintiff's husband also reports that she is limited in her ability to attend to her personal hygiene, do yard work, and pay bills. (Tr. 232-34.) According to Plaintiff's husband, he believes her depression is negatively affecting her memory, concentration, and her ability to follow instructions. (Tr. 236.)

No. 11, at 1.)   Specifically, Plaintiff argues that the ALJ's finding that she is incapable of working near moving machinery is inconsistent with her ability to perform her past relevant work as a sewing machine operator.   (*Id.* at 13-14.)   The Commissioner argues that the ALJ's determination that Plaintiff could perform her past relevant work is supported by the record and the testimony of the VE.   (Docket No. 12-1, at 11-15.)   The Commissioner is correct.

The ALJ determined that Plaintiff has the ability "to perform light work" except that she should avoid "dangerous moving machinery."   (Tr. 390.)   The DOT lists the occupation of a "non-garment" "sewing-machine operator" to be performed in "any industry," and describes the responsibilities associated with it to include operating a "sewing machine to join, gather, hem, reinforce, or decorate articles.   Performs duties as described under SEWING-MACHINE OPERATOR, REGULAR EQUIPMENT (any industry) Master Title."[24]   DICOT § 787.682-046, 1991 WL 681100 (1991).   In addition, the DOT notes that the occupation of sewing-machine

---

[24] The DOT elaborates on the duties of a sewing-machine operator who uses "regular equipment" as follows:

Operates various sewing machines to join parts of fabricated articles or garments: Places spool of thread on spindle of machine and draws thread through machine guides, tensions, and eye of needle. Inserts bobbin into shuttle and draws thread through slot in shuttle wall, or draws thread through guide and looper eye. Presses knee lever, depresses pedal, or moves hand lever to raise presser foot or spread feed cups. Positions parts to be joined under presser foot and needle and lowers presser foot. Starts, stops, and controls speed of machine, using pedal or knee lever. Guides parts under needle, using fingers and hands, and following edges, seams, guides on machine bed, or markings on part.   Observes stitching to detect defects and notifies supervisor or SEWING-MACHINE REPAIRER (any industry) when defects are caused by machine malfunction. May select sewing supplies, such as binding, braid, cord, piping, tape, thread, or welt, according to specifications or color of material. May cut excess material or thread, using blade attached to machine or scissors. May oil machine, change needles, or secure modifying attachments to machine. Classifications are usually made according to type of machine, garment part sewn, product fabricated, or modifying attachment on machine.

DICOT, 1991 WL 645979 (1991).

operator does not involve "moving mech[anical] parts."[25] DICOT § 787.682-046, 1991 WL 681100 (1991).

Significantly, the ALJ complied with the suggestion in SSR 82-61 that "it may be necessary to utilize the services of a vocational specialist or vocational expert." 1982 WL 31387 (1982). "The value of a vocational expert is that he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000). The ALJ heard testimony from a vocational expert at the hearing. *See Adams v. Astrue*, No. 08-135, 2009 WL 774845, at *8 (W.D. La. Mar. 24, 2009) (ALJ fully complied with SSR 82-61 when he employed the use of a VE at the evidentiary hearing).

The Social Security Administration requires that before an ALJ may rely on the testimony of a vocational expert, he must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [the] VE [ ] and information in the Dictionary of Occupational Titles (DOT), . . . , and Explain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4P, 2000 WL 1898704, at *1 (2000). Here, the ALJ asked the VE, "[a]re the jobs you cited consistent with the description in the Dictionary of Occupational Titles"? (Tr. 420.) The VE responded, "Yes, Your honor." (*Id.*) Plaintiff's representative questioned the VE, but did not ask whether Plaintiff's prior work as a seamstress involved "dangerous moving machinery," thus precluding her from returning to her past work as a sewing-machine operator. (*See* Tr. 421.)

As reflected by the ALJ's decision, he was clearly aware that his RFC provided that Plaintiff should avoid "dangerous moving machinery" and that her past work as a seamstress

---

[25] Specifically, the DOT states that moving mechanical parts are "not present" and that that "activity or condition does not exist." DICOT § 787.682-046, 1991 WL 681100 (1991).

involved work using sewing machines.  It is thus safe to assume that the ALJ did not consider sewing machines to be "dangerous moving machinery."  The ALJ's hypothetical questions to the VE included the limitation that Plaintiff should avoid "dangerous moving machinery." (Tr. 418-19.)  Like the ALJ, the VE was of course aware that Plaintiff used sewing machines in her past work as a seamstress, yet the VE advised the ALJ that Plaintiff could perform her past work as a seamstress.  (*Id.*)  As the Fifth Circuit has recognized, "the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so." *Carey*, 230 F.3d at 146.  "Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146-47.

The ALJ found that the VE's testimony was credible and "persuasive." (*See* Tr. 395.) This credibility finding is supported by the record. *See Bryant v. Astrue*, No. 09-1499, 2010 WL 3541097, at *5 (W.D. La. July 30, 2010) (the ALJ did not err by deferring to expertise of the VE, when VE reviewed the record and listened to Plaintiff's testimony).  As such, Plaintiff's claim that the ALJ committed reversible error by finding that she could perform her past relevant work as a sewing-machine operator should be rejected.

### III.  CONCLUSION

For the foregoing reasons, the undersigned recommends that Defendant's Motion for Summary Judgment (Docket No. 12) be GRANTED, that Plaintiff's Motion for Summary Judgment (Docket No. 10) be DENIED, that the Commissioner's decision be AFFIRMED, and

that this action be DISMISSED.   Because this report contains personal medical information about Plaintiff, the Clerk shall file this report under restricted status.

## **<u>NOTICE TO THE PARTIES</u>**

The Clerk shall send copies of this Report and Recommendation to the parties who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure.   Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on January 6, 2021.

Peter E. Ormsby
UNITED STATES MAGISTRATE JUDGE